FILED

CRAIG C. REILLY, ESQ.
VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
Telephone: 703/549-5354
703/549-2604 (fax)

2008 AUG -5 P 1: 22

C....
ALEXANDRIA, VIRGINIA

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

LO/TCB

| | |
|---|---|
| PETER RANGOS, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>CARMAX INC., MICHAEL K. DOLAN, KEITH D. BROWNING, RICHARD M. SMITH, JOSEPH S. KUNKEL, and HUGH G. ROBINSON, )<br><br>Defendants. ) | Civil Action No. 1:08cv 821<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by CarMax, Inc. ("CarMax" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of CarMax between April 2, 2008 and June 17, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Peter Rangos, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of CarMax during the Class Period and has been damaged thereby.

7.      Defendant CarMax is headquartered in Richmond, Virginia and is a nationwide retailer of new and used automotive vehicles.

8.      (a)      Defendant Michael K. Dolan ("Dolan") is, and was at all relevant times, Chief Administrative Officer and Executive Vice President of CarMax.

        (b)      Defendant Keith D. Browning ("Browning") is, and was at all relevant times, Chief Financial Officer, Executive Vice President, and Director of CarMax.

        (c)      Defendant Richard M. Smith ("Smith") is, and was at all relevant times, a Chief Information Officer and Senior Vice President of CarMax.

        (d)      Defendant Joseph S. Kunkel ("Kunkel") is, and was at all relevant times, a Senior Vice President - Marketing & Strategy of CarMax.

        (e)      Defendant Hugh G. Robinson ("Robinson") is, and was at all relevant times, a Director of CarMax.

        (f)      Defendants Dolan, Browning, Smith, Kunkel and Robinson are collectively referred to herein as the "Individual Defendants."

9.      During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CarMax, were privy to confidential and proprietary information concerning CarMax, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning CarMax, as discussed in detail below. Because of their positions with CarMax, the Individual Defendants had access to non-public information about its business, finances, products, markets and

- 2 -

present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of CarMax's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to CarMax's financial condition and performance, growth,

operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CarMax's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of CarMax common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding CarMax's business, operations, management and the intrinsic value of CarMax securities; (ii) allowed the Individual Defendants to collectively sell 365,816 shares of their personally-held CarMax common stock for gross proceeds in excess of $7.6 million; and (iii) caused Plaintiff and members of the Class (defined below) to purchase CarMax's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of CarMax between April 2, 2008 and June 17, 2008, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CarMax common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands

of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CarMax or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of CarMax;

(c)     whether the price of CarMax common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Defendant CarMax describes itself as the "the nation's largest retailer of used cars. . . [and] currently operates 98 used car superstores in 46 markets. The unique CarMax consumer offer provides our customers the opportunity to shop for vehicles the way they shop for items at other national retailers, and it is structured around four customer benefits: low, no-haggle prices; a broad selection; high quality vehicles; and a customer-friendly sales process. During the fiscal year ended February 29, 2008, the company retailed 377,244 used vehicles and sold 222,406 wholesale vehicles at its in-store auctions."

21.     In addition to purchasing, reconditioning and selling used vehicles, CarMax also sells new vehicles at five locations under franchise agreements with four new car manufacturers (Chrysler, General Motors, Nissan and Toyota).  In fiscal 2008, new vehicles comprised 4% of CarMax's total retail vehicle unit sales.

22.     CarMax also provides customers with a full range of related products and services, including the financing of vehicle purchases through CarMax Auto Finance ("CAF"), the Company's own finance operation, and third-party financing providers; the sale of extended service plans and accessories; the appraisal and purchase of vehicles directly from consumers; and vehicle repair service.

23.     Behind the scenes, the Company's proprietary store technology provides CarMax's management with real-time information about every aspect of store operations, such as inventory management, pricing, vehicle transfers, wholesale auctions and sales consultant productivity.  In addition, CarMax's store system provides a direct link to the Company's proprietary credit processing information system to facilitate the credit review and approval process.

24.     CarMax's inventory management and pricing system allows the Company to buy the mix of makes, models, age, mileage and price points tailored to customer buying preferences at each

- 6 -

superstore. This system also generates recommended retail price markdowns for specific vehicles based on complex algorithms that take into account factors including sales history, consumer interest and seasonal patterns. This systematic approach to vehicle pricing allows CarMax to optimize inventory turns, which minimizes the depreciation risk inherent in used cars and helps the Company to achieve its targeted gross profit dollars per unit.

25.     Unbeknownst to investors, during the Class Period CarMax was not meeting internal sales targets and was facing a 55% shortfall in its net income for first quarter of fiscal year 2009, later prompting the Company to suspend its financial guidance for the rest of fiscal 2009. Yet, prior to publicly disclosing this material information, five of the Company's senior executives and/or directors dumped hundreds of thousands of shares of their personally-held CarMax common stock for gross proceeds in excess of $7.6 million. When the shortfall was belatedly announces, the Company's stocked price declined approximately $2 per share, or 11%.

## Materially False and Misleading Statements
## Issued During the Class Period

26.     The Class Period begins on April 2, 2008. On that date, CarMax issued a press release announcing its financial results for the fourth quarter and fiscal year end of 2008, the period ended February 29, 2008. For the quarter, the Company reported total revenues of $2.04 billion, and net income of $21.8 million, or $0.10 per diluted share. The Company also announced its financial guidance for fiscal year 2009. Defendant Browning signed and authorized the Form 8-K which caused the press release to be filed with the SEC. The press release stated, in pertinent part, as follows:

### Expectations for Fiscal Year Ending February 28, 2009

**Fiscal 2009 Superstore Openings and Capital Expenditures.** In fiscal 2009, we plan to expand our used car superstore base by approximately 16%, opening 14 used car superstores, including 7 production and 7 non-production stores. We plan to enter nine new markets and expand our presence in four existing markets. Details of the planned store openings and other material construction projects are included in

the following table. Normal construction, permitting or other scheduling delays could shift the opening dates of any stores into a later period.

\*　　\*　　\*

In fiscal 2009, we plan to open a central reconditioning facility in the Washington, D.C. / Baltimore market, where we currently have six superstores. We have experienced strong sales growth in this market, and this facility will support additional expected market share gains. In addition, we are converting our non-production store in Ontario, California, to a production store with the addition of reconditioning facilities, which will support our continued growth in the Los Angeles market.

\*　　\*　　\*

**Fiscal 2009 Sales.** "We currently anticipate comparable store used unit sales in the range of (2)% to 5% in fiscal 2009," said Folliard. The wide range reflects an expectation of continued volatility in the market for late-model used cars. *We expect total revenues to increase between 7% and 14%,* reflecting our planned new store openings, the comparable store sales performance and anticipated declines in both used vehicle average selling prices and new car revenues.

*We are not anticipating any material change in credit availability for our customers in fiscal 2009,* despite the fact that AmeriCredit Corp. is no longer one of our third-party financing providers effective April 1, 2008. We anticipate the majority of loans previously financed by AmeriCredit will be financed by other third-party providers.

**Fiscal 2009 Earnings Per Share.** *"We currently expect fiscal 2009 earnings per share in the range of $0.78 to $0.94," continued Folliard.* The width of this range reflects the uncertainty of current market conditions, especially in the capital markets. *We expect to maintain our used and wholesale vehicle gross profits per unit at levels similar to those in fiscal 2008.*

We are anticipating that the disruption in the capital markets will continue to adversely affect CAF income throughout fiscal 2009 relative to historical norms. We expect that funding costs for CAF will remain volatile in fiscal 2009. Based on the spreads achieved in recent comparable auto ABS transactions, we estimate that CAF will have to absorb approximately $14 million of incremental funding costs upon the refinancing of the $855 million that was outstanding in the warehouse facility at the end of fiscal 2008. In addition, we continue to explore alternate funding structures to the ABS markets. We currently believe that the CAF gain percentage in fiscal 2009 will be well below the normalized range of 3.5% to 4.5%. We expect that cumulative net loss rates on fiscal 2009 originations will be consistent with losses currently anticipated on loans originated in fiscal 2008, primarily due to the stresses of the current economy.

Our fiscal 2009 earnings estimates also reflect an expected increase in our SG&A ratio. The combination of the anticipated comparable store sales performance and

the decline in average selling price, together with our continued investments supporting our growth plan will likely cause the SG&A ratio to increase in fiscal 2009. Interest expense is also expected to increase as we contemplate higher debt levels.

"While fiscal 2009 will clearly be another challenging year for us, *our confidence in the strength of the CarMax model remains as high as ever," said Folliard. "We still have a huge growth opportunity ahead of us, and we continue to believe our long-term opportunity to increase earnings and grow market share remains enormous."* [Emphasis added.]

27.    On April 25, 2008, CarMax filed with the SEC its Annual Report on Form 10-K for

the fiscal year ended February 29, 2008. Defendant Browning signed, certified, and authorized the

filing of the Company's Form 10-K with the SEC. The Form 10-K stated, in pertinent part, as

follows:

*Fiscal 2009 Sales.* We currently anticipate the change in comparable store used unit sales in the range of (2%) to 5% in fiscal 2009. The wide range reflects an expectation of continued softness in the economy and volatility in the market for late-model used cars. *We expect total revenues to increase between 7% and 14%,* reflecting our planned new store openings, the comparable store sales performance and anticipated declines in both used vehicle average selling prices and new car revenues.

*We are not anticipating any material change in credit availability for our customers in fiscal 2009*, despite the fact that AmeriCredit Corp. is no longer one of our third-party financing providers effective April 1, 2008. We anticipate the majority of loans previously financed by AmeriCredit will be financed by other third-party providers.

*Fiscal 2009 Earnings Per Share. We currently expect fiscal 2009 earnings per share in the range of $0.78 to $0.94.* The width of this range reflects the uncertainty of current market conditions, especially in the credit markets. We expect to maintain our used and wholesale gross profit dollars per unit at levels similar to those in fiscal 2008.

We currently believe the CAF gain percentage on loans originated and sold in fiscal 2009 could be well below the normalized range of 3.5% to 4.5% reflecting the continued use of a 17% discount rate in calculating the gain on loans sold, and our expectations that funding costs and cumulative net loss rates will remain at higher-than-normal levels due to the stresses of the current economy.

We are anticipating that the disruption in the credit markets will continue to adversely affect CAF income throughout fiscal 2009 relative to historical norms. In addition, based on the funding cost spreads achieved in recent comparable public securitizations, we estimate that CAF will have to absorb approximately $14 million

- 9 -

of incremental funding costs upon the refinancing of the $855 million that was outstanding in the warehouse facility to the end of fiscal 2008.

Our fiscal 2009 earnings estimates also reflect an expected increase in our SG&A ratio. The combination of the anticipated comparable store sales performance and the decline in used vehicle average selling prices, together with continued investments supporting our growth plan, will likely cause the SG&A ratio to increase in fiscal 2009.

We expect average outstanding debt will rise in fiscal 2009, which will increase our interest expense. The higher debt levels primarily relate to planned capital spending, as well as the prospect of continuing to retain some subordinated bonds in connection with future CAF securitizations. [Emphasis added.]

28.    The statements referenced above in ¶¶26 and 27 were materially false and misleading when made because they misrepresented and failed to disclose:

(a)    that CarMax was not positioned to meet its sales targets or earnings objectives for fiscal 2009;

(b)    that the Company had completed a refinancing of its warehouse facility which had materially increased the Company's funding costs; and

(c)    as a result of the foregoing, Defendants had no reasonable basis for their revenues and earnings guidance for fiscal 2009.

29.    On June 18, 2008, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2009, the period ended May 31, 2008. The Company also announced that it was suspending its financial guidance for the rest of fiscal 2009. The press release stated, in pertinent part, as follows:

- Total sales increased 3% to $2.21 billion from $2.15 billion in the first quarter of last year. This increase was led by a 6% increase in used vehicle revenues.

- Comparable store used unit sales rose 1% for the first quarter.

- Total used unit sales grew 10% for the first quarter.

- *Net earnings decreased 55% to $29.6 million, or $0.13 per diluted share*, compared with $65.4 million, or $0.30 per diluted share, earned in the first quarter of fiscal 2008.

- Earnings for the first quarter of fiscal 2009 were reduced by $0.06 per share for higher funding costs related to CarMax Auto Finance (CAF) loans originated in prior fiscal years and by $0.02 per share for accruals related to litigation.

## First Quarter Business Performance Review

**Sales.** "The slowdown in the economy, the dramatic rise in gasoline and food costs and the related impact on consumer spending adversely affected our first quarter performance," said Tom Folliard, president and chief executive officer. For the first time in more than two years, we experienced a modest decline in customer traffic in our stores. Additionally, *credit availability from our third-party nonprime lenders declined slightly during the quarter.* However, solid execution by our store teams resulted in a small improvement in our conversion rate, and this, together with the benefit of an extra Saturday in the quarter, contributed to the 1% increase in comparable store used unit sales. Despite the slower-than-expected sales, our data indicates that we continued to gain market share in the late-model used vehicle market.

Wholesale unit sales declined 2%, reflecting a decrease in both our appraisal traffic and our appraisal buy rate (defined as appraisal purchases as a percent of vehicles appraised). We believe that the significant depreciation in wholesale market values for SUVs, trucks and other less fuel-efficient vehicles contributed to the decrease in the buy rate. During the quarter, wholesale industry prices for SUVs and trucks declined nearly 25%, which is approximately four times the normal depreciation expected over this period and well in excess of the depreciation expected over a full year. "This is the most rapid depreciation of any vehicle segment that we have experienced in our 15 years," said Folliard.

New vehicle unit sales declined 26%, reflecting the combination of the soft new car sales environment and the sale of our Orlando Chrysler Jeep Dodge franchise in the second quarter of fiscal 2008. Other sales and revenues increased 4%. Third-party finance fees, a component of other sales and revenues, declined 7%, primarily reflecting a slight increase in the percentage of our sales financed by the third-party subprime provider. We record the discount at which this provider purchases loans as an offset to finance fee revenues received from other providers.

**Gross Profit.** The total gross profit per unit declined by $237 to $2,564 compared with $2,801 in the first quarter of fiscal 2008. The majority of the decline resulted from the $192 per unit decrease in gross profit per used vehicle. Several factors contributed to this decrease. Our used vehicle gross profit per unit was pressured by the slowing sales environment. The decline in appraisal traffic and the buy rate also adversely affected our gross profit per unit, as vehicles purchased directly from consumers generate more profit compared with vehicles sourced at auction. The rapid decline in the wholesale market values for SUVs and trucks resulted in significant margin pressure on this segment of our inventory, and it led us to take supplemental pricing markdowns for these vehicles, which further pressured margins. Compared with the fourth quarter of fiscal 2008, however, we achieved a $33 per unit improvement in total gross profit.

Wholesale gross profit per unit declined slightly, to $784 from $800 in the first quarter of fiscal 2008. We continued to experience strong dealer-to-car ratios at our auctions, with the normal price competition among bidders contributing to the continued solid wholesale gross profit performance.

**CarMax Auto Finance.** CAF income declined to $9.8 million from $37.1 million in the first quarter of fiscal 2008, reflecting the continuing effects of the disruption in global credit markets and the more challenging economic environment. The gain percentage, which represents the gain on the sale of loans originated and sold as a percentage of loans originated and sold, decreased to 2.7% from 4.2% in the prior year's first quarter. The decrease reflected a combination of factors, including substantially higher funding costs in the warehouse facility, which we have been unable to offset through higher consumer rates in the current environment; an increase in the discount rate assumption used to calculate the gain on the sale of loans to 17% from 12% in the first quarter of last year; and a higher loss assumption on current quarter originations compared with the assumption used in the prior year's quarter.

We are in the process of renewing our warehouse facility agreement, which expires in July. Due to conditions in the credit markets, the funding cost in the facility will increase upon its renewal, and it will align more closely with the current funding costs in the public securitization market. We have reflected these higher funding costs in the gain on sale recognized on all loans originated and sold in the first quarter of fiscal 2009. The higher warehouse facility funding costs are expected to reduce the adjustments that may otherwise be necessary at the time the loans are refinanced in a public securitization, generally one or two quarters later. We had originally expected some of these higher costs to be incurred when the public securitizations were completed and the warehouse facility was renewed in subsequent quarters.

*CAF income for the first quarter of fiscal 2009 was reduced by $20.0 million for adjustments primarily related to loans originated during prior fiscal years. This amount includes the impact of the increase in the funding costs for $750 million of loans that were refinanced from our warehouse facility in a private securitization completed in May 2008.* It also includes the applicable incremental warehouse facility funding costs applied to the remaining $95 million of loans that were originated in previous fiscal years and that were still in the warehouse facility at the end of the first quarter. This $20.0 million of higher funding costs exceeded the $14 million that we had built into our fiscal 2009 expectations due to a further increase in funding costs spreads in the securitization markets.

In the first quarter of fiscal 2009, we made no material changes to our loss assumptions on previously securitized receivables.

**SG&A.** Selling, general and administrative expenses were 11.0% of total revenues in the first quarter of fiscal 2009 compared with 10.0% in the prior year's first quarter. The majority of this increase was expected, and it largely resulted from the combination of the modest level of comparable store used unit sales growth, our continued commitment to our store growth plan and the decline in the used vehicle

average selling price. In addition, in the first quarter of fiscal 2009 we accrued costs related to litigation that reduced net earnings by $0.02 per share.

**Earnings and Earnings Per Share.** *First quarter net earnings declined to $29.6 million, or $0.13 per share, from $65.4 million, or $0.30 per share, in fiscal 2008. "The decrease in earnings was primarily related to the reductions in gross profit per unit and CAF income, as well as the lower-than-expected sales,* all of which we believe were the direct result of external conditions," said Folliard. "We are encouraged, however, by our continued ability to execute in our stores and to gain market share, regardless of the external environment."

*     *     *

<u>**Fiscal 2009 Expectations**</u>

*"Our first quarter sales were modestly below expectations and earnings were disappointing," said Folliard. "Sales slowed through the quarter, and since Memorial Day weekend, traffic and sales weakened further. If the current trends persist, results for the full year could be significantly below the bottom of our original earnings guidance range.* As a result of the combination of the uncertain economic conditions, rising fuel and food costs and weak consumer sentiment, exacerbated by the rapid depreciation in SUVs and trucks, *we are temporarily suspending guidance on comparable store sales and earnings for fiscal 2009.* We hope to provide updated guidance later in the year, when there is a more stable outlook for the economy and we have better visibility on trends.

"While this is clearly a difficult environment for many big-ticket retailers, we remain confident in our differentiated business model, our ability to consistently gain market share, and our ability to satisfy customers, all of which support our continued store growth plan," said Folliard. [Emphasis added.]

30.     Upon this news, shares of the Company's stock fell $2 per share, or approximately 11%, to close at $16.34 per share, on heavy trading volume.

31.     On June 25, 2008, in an article entitled *CarMax Executives Sold Before Shortfall,* the Wall Street Journal reported the highly-suspicious insider trading that proceeded the June 18, 2008 announcement:

Five insiders sold shares, mostly after the exercise of stock options, for $18.60 to $21.61 a share, according to regulatory filings. After the company reported a 55% decrease in fiscal-first-quarter net income on June 18, shares closed at $16.34. *Had the insiders waited and conducted their transactions after the earnings report, their proceeds would have been just $2.7 million, a drop of nearly 40% . . . .*

"These sales are very well-timed," said Ben Silverman, research director for InsiderScore, a firm that tracks and rates insider transactions. He said CarMax insiders may have had some idea that the quarter wasn't going well.

Mr. Silverman noted that though many of the shares sold were acquired through the exercise of stock options, some of the executives sold more shares than they acquired, which he called a "red flag." Chief Financial Officer Keith Browning, for example, sold 150,000 shares on May 6 after acquiring 100,000 through option exercises.

Chief Administrative Officer Michael Dolan parted with 135,000 shares on May 15, after acquiring 90,000 through option exercises. The sales, which came with less than three weeks left in the quarter, were Mr. Dolan's first since January 2007, regulatory filings show. [Emphasis added.]

32.     The market for CarMax common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, CarMax common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CarMax common stock relying upon the integrity of the market price of CarMax common stock and market information relating to the Company, and have been damaged thereby.

33.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CarMax common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

34.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about CarMax's business, prospects and operations. These material misstatements and

- 14 -

omissions had the cause and effect of creating in the market an unrealistically positive assessment of CarMax and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

35.      As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CarMax, their control over, and/or receipt and/or modification of CarMax's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning CarMax, participated in the fraudulent scheme alleged herein.

36.      Defendants were further motivated to engage in this course of conduct in order to allow the Individual Defendants to collectively sell 365,816 shares of their personally-held CarMax common stock for gross proceeds in excess of $7.6 million during the Class Period.

37.      On April 14, 2008, Defendant Robinson sold 10,816 shares of his personally-held CarMax common stock for proceeds of approximately $202,000.

38.      On April 21, 2008, Defendant Kunkel sold 45,000 shares of his personally-held CarMax common stock for proceeds of approximately $906,000.

39.     On April 29, 2008, Defendant Smith sold 25,000 shares of his personally-held CarMax common stock for proceeds of approximately $540,000.

40.     On May 6, 2008, Defendant Browning sold 150,000 shares of his personally-held CarMax common stock for proceeds of approximately $3,132,000.

41.     On May 15, 2008, Defendant Dolan sold 135,000 shares of his personally-held CarMax common stock for proceeds of approximately $2,856,000.

### Loss Causation/Economic Loss

42.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of CarMax common stock and operated as a fraud or deceit on Class Period purchasers of CarMax common stock by failing to disclose that CarMax was not positioned to meet its sales targets or earnings objectives for fiscal 2009; its controls and procedures, including internal control over financial reporting were inadequate; and as a result of the foregoing, the Company had no reasonable basis for its revenues and earnings guidance for fiscal 2009. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of CarMax common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of CarMax common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

43.     As a direct result of the disclosures on June 18, 2008, the price of CarMax common stock fell precipitously, falling by $2 per share, or approximately 11%. These disclosures removed the inflation from the price of CarMax common stock, causing real economic loss to investors who had purchased CarMax common stock during the Class Period.

44.     The precipitous decline in the price of CarMax common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed

- 16 -

to investors and the market. The timing and magnitude of the price decline in CarMax common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of CarMax common stock and the subsequent significant decline in the value of CarMax common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

45.     At all relevant times, the market for CarMax common stock was an efficient market for the following reasons, among others:

(a)     CarMax common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, CarMax filed periodic public reports with the SEC and the NYSE;

(c)     CarMax regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     CarMax was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

46.     As a result of the foregoing, the market for CarMax common stock promptly digested current information regarding CarMax from all publicly available sources and reflected such information in the prices of the stock.   Under these circumstances, all purchasers of CarMax common stock during the Class Period suffered similar injury through their purchase of CarMax common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CarMax who knew that those statements were false when made.

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

51.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CarMax common stock.  Plaintiff and the Class would not have purchased CarMax common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

52.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of CarMax common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    The Individual Defendants acted as controlling persons of CarMax within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of CarMax, and their ownership of CarMax stock, the Individual Defendants had the power and authority to cause CarMax to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 6, 2008

CRAIG C. REILLY, ESQ.
VSB # 20942

CRAIG C. REILLY, ESQ.

111 Oronoco Street
Alexandria, Virginia 22314
Telephone: 703/549-5354
703/549-2604 (fax)
craig.reilly@ccreillylaw.com

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, CO 80203
Telephone: (303) 861-1764
(303) 395-0393 (fax)

HOLZER, HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
1117 Perimeter Center West, Suite E-107
Atlanta, GA 30338
Telephone: (770) 392-0090
(770) 392-0029 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Peter Rangos ("Plaintiff") declares, as to the claims asserted, or to be asserted, under the federal securities laws against CarMax, Inc. and any additional individuals or entities against whom claims shall be asserted in connection with my purchase and/or acquisition of securities of CarMax, Inc. (NYSE: KMX) that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transactions in the funds that are the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| KMX | 05/28/2008 | 600 (@ $19.50) | $ 11,700 |
| | 06/02/2008 | 1060 (@ 19.50) | 20,670 |
| | | | $ 32,370 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| KMX | 07/01/2008 | 1660 (@14.20) | $ 23,572 |

5.      During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of July , 2008 in INDIALANTIC , FLORIDA .

City                          State

(Signature) X _____ Peter Rangos _____